### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES JOSEPH SALERNO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 2582 |
| v. | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Joseph Salerno filed this action seeking review of the final de-
cision of the Commissioner of Social Security ("Commissioner") denying his applica-
tion for Disability Insurance Benefits ("DIB") under Title II of the Social Security
Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the ju-
risdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c),
and have filed cross-motions for summary judgment. For the reasons stated below,
this case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security In-
come ("SSI") under Titles II and XVI of the SSA, a claimant must establish that he
or she is disabled within the meaning of the SSA.[1] *York v. Massanari*, 155 F. Supp.

---

[1] The regulations governing the determination of disability for DIB are found at 20
C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations
and are set forth at 20 C.F.R. § 416.901 *et seq*.

2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, 2008 WL 687132, at *1 (S.D. Ill. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on November 17, 2006, alleging he became disabled on October 8, 2003, due to head injury, seizures, memory loss, hearing loss, migraines,

and leukemia, in remission. (R. at 11, 57, 122, 126.) The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 11, 57, 58, 77.)

On May 13, 2008, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 11, 18–56.) The ALJ also heard testimony from Jean Salerno, Plaintiff's wife, and Grace Gianforte, a vocational expert ("VE"). (*Id.*)

The ALJ denied Plaintiff's request for benefits on September 3, 2008. (R. at 11–17.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from October 8, 2003, his alleged onset date, through December 31, 2005, his date last insured.[2] (*Id.* at 13.) At step two, the ALJ found that Plaintiff's seizure disorder was a severe impairment. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 13–14.)

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff has the RFC to perform a

> full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes and scaffolds, but frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He should avoid concentrated exposure to hazards and is limited to simple, repetitive tasks.

---

[2] In a DIB claim, a claimant must establish disability on or before the date last insured. 20 C.F.R. §§ 404.131, 404.315(a)(1).

[3] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

(R. at 14.) Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff could not perform any past relevant work. (*Id.* at 16.) At step five, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that there were jobs that existed in significant numbers in the regional economy that Plaintiff could have performed, including work as a library clerk, office helper, and electrical accessories assembler. (*Id.* at 16–17.) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 17.)

The Appeals Council denied Plaintiff's request for review on March 18, 2010 (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v.*

*Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

### A. Medical Evidence

Plaintiff last worked on October 8, 2003. (R. at 25, 439.) On that day, Plaintiff was working as an investigator for the State's Attorney's Office and was injured when he stood up in a surveillance van and hit his head. (*Id.* at 439.) Shortly thereafter, he had a series of generalized seizures. (*Id.* at 247, 250, 254, 256, 281, 439.) He was taken to LaGrange Hospital where he was admitted and given an initial workup. (*Id.* at 247, 439.) Treating physicians diagnosed mild head trauma, possible

concussion, muscle spasms in the neck, chronic myeloid leukemia, and a probable seizure, with postictal confusion and lethargy. (*Id.* at 247, 252–53, 257–58.) Plaintiff was discharged from the hospital on October 11, 2003, and prescribed Fioricet, as needed, and Dilantin.[4] (*Id.* at 247.)

Nestor M. Ivkov, M.D., a neurologist, began treating Plaintiff in December 2003 (R. at 468), and continued to treat him on a regular basis thereafter (*id.* at 448–67). On December 11, 2003, Plaintiff complained of poor memory, mood changes, and poor response time. (*Id.* at 468.) After a physical examination, Dr. Ivkov diagnosed two episodes of complex partial seizures and a head injury. (*Id.* at 469.) He found that while Dilantin was effective at preventing more seizures, Plaintiff exhibited some side effects such as mental slowing and mild emotional dullness. (*Id.*) Nevertheless, Dr. Ivkov recommended that Plaintiff stay on the medication for at least two years. (*Id.*)

As of February 27, 2004, Plaintiff remained seizure-free, but complained of lightheadedness, feeling strange, insomnia, headaches, poor memory, and anxiety. (R. at 467.) Dr. Ivkov reported that Plaintiff's poor memory, irritability, and clouding of psyche are all known side effects of Dilantin. (*Id.*) Dr. Ivkov considered switching him to Tegretol,[5] but since Plaintiff had a number of symptoms that indi-

---

[4] Fioricet is a combination of drugs used to relieve mild to moderate pain or tension headaches. Dilantin is an anticonvulsant, which is prescribed to control seizures by decreasing abnormal electrical activity in the brain. <http://www.nlm.nih.gov/medlineplus/druginformation.html> (hereinafter MedlinePlus) (last visited Oct. 13, 2011).

[5] Tegretol is also an anticonvulsant used to control seizures. *See* Medline Plus (last visited Dec. 9, 2011).

cated postconcussion syndrome,[6] he decided to start him on Zoloft[7] and see if there
were any improvements in a month. (*Id.*)

On May 5, 2004, Dr. Ivkov found that Plaintiff's seizures were well controlled
but that he had right orbital headaches and poor concentration. (R. at 466.) Dr.
Ivkov concluded that Plaintiff was "slowly improving" but may have developed post-
traumatic migraines. (*Id.*) He continued Plaintiff on Dilantin and Zoloft and discon-
tinued his prescriptions for Fioricet and Vicodin. (*Id.*)

On June 18, 2004, Plaintiff's seizures were under control but he reported diffi-
culties with his memory, blurring of his mind, and significant problems making de-
cisions. (R. at 465.) He becomes very anxious and fears panic attacks when faced
with having to make certain decisions. (*Id.*) Dr. Ivkov found nothing remarkable
during a physical examination and recommended that Plaintiff be sent for neuro-
psychological testing. (*Id.*) In early November 2004, Plaintiff was treated at Advo-
cate Christ Medical Center after he awoke with vertigo and nausea. (*Id.* at 376.) On
November 11, 2004, Plaintiff reported anxiety attacks and an inability to concen-
trate. (*Id.* at 464.) Dr. Ivkov found that neurologically, Plaintiff was normal. (*Id.*)

On January 24, 2005, Plaintiff underwent an independent psychiatric evalua-
tion. (R. at 1506–08.) During the evaluation, Plaintiff began to complain of right
temporal pain and reported that he felt "weird, like shaking." (*Id.* at 1506.) He

---

[6] "Postconcussion syndrome, which commonly follows a significant concussion, includes
headache, dizziness, fatigue, difficulty concentrating, variable amnesia, depression, apathy,
and anxiety." *The Merck Manual of Diagnosis and Therapy* 2575 (18th ed. 2006) (hereinaf-
ter *Merck Manual*).

[7] Among other uses, Zoloft is prescribed for depression, obsessive-compulsive disorder,
and posttraumatic stress disorder. *See* Medline Plus (last visited Dec. 9, 2011).

started crying, stating that he could not think. (*Id.*) While his blood pressure was being tested, he complained that he had no feeling in his left leg and his right leg was tingling. (*Id.*) He then lowered himself to the floor and began to groan and retch saliva onto the floor. (*Id.*) When his wife came into the examination room, his symptoms worsened and he rolled himself into a fetal position. (*Id.*)

Plaintiff was taken to the emergency room at Northwestern Memorial Hospital. (R. at 1510–57.) While examining physicians first thought Plaintiff may have had a seizure, they later determined that a seizure was unlikely. (*Id.* at 1526, 1536–37.) Plaintiff was diagnosed with a possible anxiety attack. (*Id.* at 1526.) After he was released from the hospital, Plaintiff had two more episodes of unresponsiveness in front of his wife. (*Id.* at 463.) On January 27, 2005, Paul Oswiecimski, M.D., Plaintiff's primary care doctor (*see id.* at 414), recommended a psychological evaluation to determine whether Plaintiff has an anxiety disorder (*id.* at 296).

On February 9, 2005, Plaintiff complained of severe headaches, chest pain, and numbness in his left arm. (R. at 463). Upon examination, Dr. Ivkov found Plaintiff to be neurologically stable with recurrent unresponsive spells. (*Id.*) "The real nature, meaning epileptic versus functional, needs to be elucidated again." (*Id.*) Dr. Ivkov concluded that it was "impossible to say what the nature and source of the seizures are; however, head injury cannot be completely excluded as the source of this problem." (*Id.*)

On March 7, 2005, Plaintiff was admitted to the hospital after complaining of periods of unresponsiveness and multiple seizures, pseudoseizures or syncope.[8] (R. at 298, 661, 663, 666.) Upon admission, he was postictal, having two seizures continuously. (*Id.* at 661.) During his three-day hospital stay, one doctor ruled out malingering, diagnosed questionable seizures or seizures superimposed by pseudoseizures, and assigned him a Global Assessment of Functioning ("GAF") score of 40.[4] (*Id.* at 661, 665.) Another doctor concluded that Plaintiff was having pseudoseizures or anxiety attacks. (*Id.* at 661.)

On March 23, 2005, Dr. Ivkov examined Plaintiff and found him to be stable neurologically. (R. at 462.) "Still [Plaintiff] is having problems with spells, which may be epileptic but also pseudoepileptic. (*Id.*) Dr. Ivkov opined that Plaintiff should remain "off work until further notice because of liability issues and unpredictability of his course." (*Id.*)

On May 4, 2005, Dr. Ivkov reported that Plaintiff had another seizure spell in early April 2005. (R. at 461.) "He saw a source of flashing light (disco ball at the public function he was attending with his wife). He froze up and passed out. He was able to walk out of the room but had minor tremors once outside." (*Id.*) Dr. Ivkov di-

---

[8] Syncope is a "sudden, brief loss of consciousness." *Merck Manual* 584.

[4] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter DSM). A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* at 34.

agnosed recurrent seizures and prescribed Keppra[9] with the intention of slowly weaning him off of Dilantin. Following the medication change, Plaintiff experienced periods of lethargy when he needed to sleep for three hours at a time. (*Id.* at 1629, 1631). He also reported episodes of weakness, slurred speech and somnolence subsequent to the medication change. (*Id.* at 413.)

On May 26, 2005, Plaintiff was admitted to the hospital after complaining of difficulty walking, weakness, confusion, right frontal headaches and garbled speech. (R. at 395–96, 1629.) The examining physician reported lethargy and slow, slurred speech. (*Id.* at 1631.) Plaintiff was diagnosed with seizure activity and a history of traumatic brain injury and weakness. (*Id.* at 396.)

Plaintiff treated with Sudhir Gokhale, M.D., a psychiatrist, in May and June 2005. (R. at 425–28, 462.) On June 28, 2005, Dr. Gokhale concluded that Plaintiff did not have psychiatric issues but instead had problems secondary to his brain injury. (*Id.* at 428.)

On June 24, 2005, Dr. Ivkov reported that Plaintiff had another seizure in the previous month. (R. at 460.) Upon physical examination, Dr. Ivkov found that Plaintiff was stable but complains of poor sleep, anxiety, and weight gain. (*Id.*) Dr. Ivkov increased the Keppra dosage and recommended that Plaintiff complete a sleep study and see Moises Gaviria, M.D., a neuropsychiatrist who specializes in organic brain syndromes. (*Id.*)

---

[9] Keppra is an anticonvulsant, which is prescribed to treat certain types of seizures in people with epilepsy by decreasing abnormal excitement in the brain. *See* MedlinePlus (last visited Dec. 9, 2011).

On August 8, 2005, Plaintiff was transported to the emergency room by ambulance after experiencing fatigue, weakness, headache, eye pain, numbness and shaking, and after passing out for about 15 minutes. (R. at 407, 1575, 1577.) In the ambulance, Plaintiff experienced shaking and vomiting. (*Id.* at 1575.) At the hospital, Plaintiff experienced two more seizures. (*Id.* at 407.) CT scans of his head were unremarkable. (*Id.* at 343.) Nevertheless, the examining physician diagnosed seizure with prolonged postictal state. (*Id.* at 1575.) For insurance reasons, Plaintiff was transferred to Christ Hospital. (*Id.* at 407, 1577.) There, the examining physician opined that Plaintiff may need a second seizure medication prescribed. (*Id.* at 410.)

On August 16, 2005, Dr. Ivkov reported that Plaintiff was seizure-free, although complaining of right temporal headache and overall heaviness. (R. at 459.) Upon physical examination, Dr. Ivkov found Plaintiff in good condition with normal neurological signs. (*Id.*) He discontinued Allegra, reduced Plaintiff's Zoloft dosage, continued Keppra, and prescribed Elavil.[10] (*Id.*) Dr. Ivkov again recommended that Plaintiff see a neuropsychological specialist and Dr. Gaviria for possible organic brain syndrome. (*Id.*)

On January 18, 2006, Plaintiff had a seizure after undergoing a bone marrow biopsy for his leukemia. (R. at 1474.) He was taken to the emergency room, where the attending physician observed him to be initially postictal, but nonverbal. (*Id.*)

---

[10] Elavil is used to treat migraine headaches and symptoms of depression. *See* MedlinePlus (last visited Dec. 9, 2011).

Thereafter, he showed progressive improvement to the point that he was able to have a conversation. (*Id.*)

On January 18, 2007, Kirk Boyenga, Ph.D., a state agency physician, conducted a psychiatric review of the medical record. (R. at 527–40.) Dr. Boyenga concluded that there was insufficient evidence to evaluate Plaintiff's claim. (*Id.* at 527, 539.)

On January 19, 2007, Richard Bilinsky, M.D., a state agency physician, reviewed the medical record and made a physical RFC assessment. (R. at 541–48.) Dr. Bilinski concluded that Plaintiff had no exertional limitations but because of his seizure disorder, should never climb ropes, ladders or scaffolds, and should avoid unprotected heights. (*Id.* at 542–43, 545.) This assessment was affirmed by two other state agency physicians on March 19 and 22, 2007. (*Id.* at 680–85.)

On February 7, 2007, Michael J. Di Domenico, Psy.D., attempted to conduct a neuropsychological evaluation. (R. at 742, 744.) During the evaluation, Plaintiff collapsed and became unresponsive. (*Id.* at 744.) The evaluation was postponed and Plaintiff was taken to Rush North Shore Hospital by ambulance. (*Id.* at 744.)

Dr. Di Domenico conducted the neuropsychological evaluation on February 27, 2007. (R. at 742–49). He reviewed the medical records, interviewed Plaintiff and his wife, and conducted a number of tests. (*Id.* at 742–43.) Plaintiff "attempted all tests presented and did not display any pattern of behavior which would invalidate the testing." (*Id.* at 744.) Dr. Di Domenico found that Plaintiff's "motor activity was well organized and goal directed, but at times there appeared to be a component of

slowed mental processing." (*Id.*) As to Plaintiff's mental functioning, Dr. Di Domenico found that Plaintiff

> demonstrates difficulties with tasks that require concentration, thinking and remembering clearly. Research suggests that those that suffer seizure activity may have many of these feelings. To complicate matters [Plaintiff] experiences a significant amount of anxiety that appears to be characterological. When he becomes stressed his anxiety can reach panic proportions.

(*Id.* at 747.) Dr. Di Domenico concluded that Plaintiff has "subtle neuropsychological deficits that are global but predominantly include attention, concentration, speed of motor and mental processing, memory, retrieval and verbal fluency." (*Id.* at 748.) He diagnosed Cognitive Disorder NOS mild, Anxiety NOS, Depression NOS, and Obsessive-Compulsive Personality Traits. (*Id.*)

At the hearing, Plaintiff testified that between 2003 and 2005, he was experiencing five to ten seizure episodes a month. (R. at 28.) Over the years, the seizures became more intense. (*Id.*) The seizures are triggered by bright lights, sounds, and smells. (*Id.* at 44.) He stated that his seizure medications caused headaches, ringing in his ears, vertigo, drowsiness and dizziness. (*Id.* at 27, 31.) Plaintiff also has trouble concentrating; he feels like his brain "is slowing down." (*Id.* at 27, 39.)

Plaintiff's spouse testified that Plaintiff gets extremely tired when he tries to do anything and has trouble with his balance. (R. at 46, 49.) She stated that Plaintiff does not retain any information that he reads. (*Id.* at 46.) She testified that Plaintiff's seizures have been getting more severe with time. (*Id.* at 48; *see id.* at 46–49.) Plaintiff is unable to do laundry because he cannot make sense out of the information on clothing labels. (*Id.* at 50.)

The VE testified that someone with a history of a seizure disorder is not employ-able unless

> they have been seizure free for at least six months, or if they do have breakthrough seizures, those seizures are only brief moments of dis-traction that aren't going to pose a danger to a person in the workplace where they will lose their balance, or have any other kind of distract-ing symptoms.

(R. at 55.)

## B. Analysis

The ALJ found that through Plaintiff's last day insured, he had a seizure disor-der. (R. at 13.) Nevertheless, the ALJ concluded that "[t]he objective evidence falls short of demonstrating the existence of pain and limitations that are so severe that [Plaintiff] cannot perform any work on a regular and continuing basis." (*Id.* at 14–15.) Although Plaintiff testified that he was experiencing five to ten seizures a month, treatment notes suggested that Plaintiff was seizure free for months at a time. (*Id.* at 15.) For this reason, the ALJ found Plaintiff "not fully credible." (*Id.*) While the ALJ acknowledged Plaintiff's history of a seizure disorder, he emphasized that Plaintiff had a normal MRI immediately following his head injury and later CT scans of Plaintiff's head were unremarkable. (*Id.*) The ALJ also found that Plain-tiff's seizures were controlled with medication. (*Id.*)

"Based upon both the objective findings and giving partial credibility to some of [Plaintiff's] subjective complaints," the ALJ found that Plaintiff "remains able to perform work at all exertional levels, however, because of dizziness and vertigo he should never climb ladders, ropes and scaffolds, and should avoid concentrated ex-posure to hazards." (R. at 15–16.) Further, "based on [Plaintiff's] complaints of an

inability to focus and headaches," the ALJ limited Plaintiff to "simple, repetitive tasks." (*Id.* at 16.)

Plaintiff contends that the ALJ's RFC assessment did not sufficiently account for all of his limitations. (Mot. 11–13.) He asserts that the ALJ discussed the evidence in a very limited fashion, ignored relevant evidence, and did not consider the evidence as a whole. (*Id.* 11–13.) Plaintiff also contends that the ALJ improperly rejected the opinion of Plaintiff's treating physician and substituted his own medical conclusions. (*Id.* 13–14.) Plaintiff asserts that the ALJ selectively addressed the medical evidence, ignored evidence of pseudoseizures and anxiety attacks, and discounted the VE's testimony. (*Id.* at 11–13.)

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling ("SSR")[11] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

Here, the ALJ failed to construct a logical bridge between the evidence and the RFC. First, the ALJ makes sparse references to the medical evidence. Although the record totals over 1700 pages, the ALJ's analysis barely exceeds a page. (*See* R. at 14–16.) While the ALJ is not required to address every piece of evidence, he must provide a "logical bridge" between the evidence and his conclusion. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions.").

Second, the ALJ cannot discuss only those portions of the treating physician's reports that support his opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v.*

*Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). The ALJ concluded that "[a]lthough there is evidence of breakthrough seizures,[12] with medication, seizure activity is controlled." (R. at 15.) On the contrary, the medical evidence demonstrates that Plaintiff was having recurrent seizures during the relevant time period. (*Id.* at 247 (multiple seizures in October 2003), 661 (multiple seizures in March 2005), 461 (reported seizure in April 2005), 396 (diagnosed with seizure activity after being admitted to hospital in May 2005), 407 (multiple seizures after hospital admission in August 2005).) Further, Plaintiff's seizures frequently involved significant physical symptoms. (*Id.* at 461 (Plaintiff froze up, passed out and experienced minor tremors), 395–96, 1629 (Plaintiff had difficulty walking, weakness, confusion, and garbled speech), 407, 1575, 1577 (Plaintiff passed out for 15 minutes and experienced shaking and vomiting).) The VE testified that a person is not employable if his seizures include distracting syndromes or pose a danger to a person where they will lose their balance. (R. at 55.)

Third, the ALJ erred in discounting Plaintiff's symptoms because "[a] magnetic resonance image ("MRI") of the brain immediately following the head injury was normal[, and] there was no CT evidence of acute intracranial abnormality." (R. at 15) (citations omitted). However, the record contains no evidence of malingering. (*See, e.g., id.* at 665 (ruling out malingering), 744 (finding that Plaintiff "attempted

---

[12] "A breakthrough seizure is an epileptic seizure that occurs, despite the use of anticonvulsants that have otherwise successfully prevented seizures in the patient." <http://en.wikipedia.org/wiki/Breakthrough_seizure> (last visited Dec. 9, 2011).

all tests presented and did not display any pattern of behavior which would invalidate the testing").) Moreover, there is evidence that at least some of Plaintiff's seizures were pseudoepileptic or psychogenic in nature. Psychogenic seizures

> are seizures that do not have a physical cause. They can be caused by stress, injury, emotional trauma, or mental illness. Psychogenic seizures are not caused by epilepsy. But people with epilepsy may have psychogenic seizures. . . . Psychogenic seizures are not caused by abnormal electrical activity in the brain. A person having a psychogenic seizure will not have the typical electroencephalogram (EEG) findings of an epileptic seizure. The events that are witnessed during a psychogenic seizure tend to vary from seizure to seizure. This is different from epileptic seizures, which seem to progress in a similar pattern every time.

Monica Rhodes, *Psychogenic Seizures*, Healthwise, last updated Oct. 15, 2009, <http://www.med.nyu.edu/healthwise>.

In June 2004, Dr. Ivkov found nothing remarkable during a physical examination but recommended that Plaintiff seek neuropsychological testing. (R. at 465.) In January 2005, Plaintiff was taken to the emergency room with seizure symptoms but examining physicians later determined that a seizure was unlikely. (*Id.* at 1506, 1526, 1537–37.) Instead, Plaintiff was diagnosed with a possible anxiety attack (*id.* at 1526), and Dr. Oswiecimski recommended a psychological examination to determine whether he has an anxiety disorder (*id.* at 296). In February 2005, Dr. Ivkov concluded that it was "impossible to say what the nature and source of [Plaintiff's] seizures are; however, head injury cannot be completely excluded as the source of this problem." (*Id.* at 463.) In March 2005, Plaintiff was admitted to the hospital after complaining of multiple seizures. (*Id.* at 298, 661, 663, 666.) During his three-day hospital stay, one doctor diagnosed questionable seizures or seizures superim-

posed by pseudoseizures. (*Id.* at 661, 665.) Another doctor opined that Plaintiff was having pseudoseizures or anxiety attacks.[13] (*Id.* at 661.) Later that month, Dr. Ivkov found Plaintiff to be stable neurologically, but having problems with seizure spells, which may be epileptic or pseudoepileptic. (*Id.* at 462.) In August 2005, Plaintiff was taken to the hospital after experiencing fatigue, weakness, headache, eye pain, numbness and shaking, and after passing out for about 15 minutes. (*Id.* at 407, 1575, 1577.) CT scans of his head were unremarkable. (*Id.* at 343.) Neverthe-less, the examining physician diagnosed seizure with prolonged postictal state. (*Id.* at 1575.) Later that month, Dr. Ivkov recommended that Plaintiff see a specialist for possible organic brain syndrome. (*Id.* at 459.)

In February 2007, Dr. Di Domenico conducted a neuropsychological examination of Plaintiff. (R. at 742–49.) Although the examination postdated the date last in-sured, Dr. Di Domenico related his findings back to Plaintiff's October 2003 head injury. (*Id.* at 742–43, 748.) He concluded that Plaintiff has "subtle neuropsy-chological deficits that are global but predominantly include attention, concentra-tion, speed of motor and mental processing, memory, retrieval and verbal fluency." (*Id.* at 748.) Dr. Di Domenico diagnosed Cognitive Disorder NOS mild, Anxiety NOS, Depression NOS, and Obsessive-Compulsive Personality Traits. (*Id.*)

In sum, given the unknown etiology of Plaintiff's seizure activity, the lack of MRI and CT abnormalities is not unexpected. If some of Plaintiff's seizures were not epi-

---

[13] While the Commissioner contends that the ALJ considered Plaintiff's pseudoseizures (Resp. 6), there is no reference in the ALJ's decision to pseudoseizures or anxiety attacks (R. at 14–16).

leptic in nature, the MRI and CT tests would be normal. *See Lamb v. Astrue*, 2008 WL 4392999, at *3 n.3 (C.D. Cal. Aug. 21, 2008). "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870; *see Rohan*, 98 F.3d at 968 ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Fourth, even assuming that Plaintiff's medications were controlling his seizures, the ALJ disregarded their side effects, which significantly interfered with Plaintiff's ability to work. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (instructing Commissioner to consider the side effects of a claimant's medications); *Grieves v. Astrue*, 2008 WL 2755069, at *16 (N.D. Ill. July 11, 2008) (requiring ALJ to include the side effects of claimant's medications in disability determination); *see also Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (observing that ALJ must consider medication side effects when evaluating claimant's credibility). In December 2003, Dr. Ivkov found that Plaintiff exhibited side effects from Dilantin, such as mental slowing and mild emotional dullness. (R. at 469.) In February 2004, Dr. Ivkov reported that Plaintiff's poor memory, irritability and clouding of psyche were all known side effects of Dilantin. (*Id.* at 467.) In May and June 2004, Plaintiff's seizures were under control but he was experiencing posttraumatic migraines, poor concentration, difficulty with memory, blurring of his mind, and significant problems making decisions. (*Id.* at 465–66.) In May 2005, Plaintiff was prescribed a different anticonvulsant medication. (*Id.* at 461.) Following the change, however,

Plaintiff experienced periods of extreme lethargy, episodes of weakness, confusion, slurred speech and somnolence. (*Id.* at 395–96, 413, 1629, 1631.) Plaintiff testified that his seizure medications caused headaches, ringing in his ears, vertigo, drowsiness and dizziness.[14] (*Id.* at 27, 31.) His spouse testified that Plaintiff gets extremely tired when he tries to do anything, has trouble with his balance, and does not retain any information that he reads. (R. at 46, 49.)

Defendant argues that the ALJ adequately addressed Plaintiff's headaches and medication side effects by limiting him to simple, repetitive work. (Resp. 6.) However, the ALJ did not address all of the reported side effects of Plaintiff's medications. (*See* R. at 14–16.) By speculating what the ALJ might have meant, the Commissioner "violated the *Chenery* doctrine (*see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)), which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922; *see Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). In any event, the ALJ fails to provide any reasoning for his determination that headaches and an inability to focus limit Plaintiff to simple, repetitive tasks.

---

[14] The ALJ found Plaintiff "not fully credible." (R. at 15.) However, "[t]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562; *see Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); SSR 96-7p, at *1. Further, the ALJ must explain which of Plaintiff's allegations are credible, which are incredible, and provide reasoning in support of his findings. *Groneman v. Barnhart*, 2007 WL 781750, at *11 (N.D. Ill. March 9, 2007); SSR 96-7p, at *2. Finally, the ALJ failed to discuss the SSR 96-7p factors. "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, at *3.

(*See* R. at 16.) As a result, the ALJ failed to develop an RFC that includes "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, at *6–7.

Finally, the ALJ erred in relying on the opinions of the nontreating, nonexamining state agency physicians (R. at 15), over the opinions of Plaintiff's treating physicians. It does not appear that the state agency physicians reviewed the entire record before making their conclusions. Dr. Boyenga, who conducted a psychiatric review, merely stated that "[t]here is insufficient evidence to evaluate this claim for that period of time." (*Id.* at 539.) Similarly, Dr. Bilinsky appears to have made his physical RFC assessment on the basis of a single physical examination in August 2005. (*Id.* at 548.) In any event, "a contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Oakes v. Astrue*, 258 F. App'x 38, 44 (7th Cir. 2007); *Holmes v. Astrue*, 2008 WL 5111064, at *7 (W.D. Wis. 2008) ("A contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion.").

On remand, the ALJ shall reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. The RFC shall include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and

nonmedical evidence. SSR 96-8p. In making his determination, the ALJ shall explain which of Plaintiff's allegations are credible, which are incredible, and provide reasoning in support of his findings.

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate Plaintiff's mental and physical impairments and RFC, considering all of the evidence of record, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 20] is **GRANTED**, and Defendant's Cross-Motion for Summary Judgment [Doc. 26] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: December 16, 2011

_Nan R. Nolan_
NAN R. NOLAN
United States Magistrate Judge